UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| GAIL FIALKOV, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　Plaintiff,<br><br>　v.<br><br>MICROSOFT CORPORATION, et al.,<br><br>　　　　　　　　　Defendants. | Case No. 2:13-cv-02039-RSM<br><br>ORDER DISMISSING THE CONSOLIDATED AMENDED COMPLAINT |

　　　This matter comes before the Court upon Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Complaint pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rules of Civil Procedure 9(b) and 12(b)(6). Dkt. # 53. Specifically, Defendants Microsoft Corporation ("Microsoft") et al. assert that Plaintiffs fail to plead sufficient facts to support the inference that various Microsoft statements were false or misleading when made or that Defendants acted with the requisite scienter. The Court deems oral argument unnecessary. For the reasons stated herein, the Court agrees with Defendants that Plaintiffs have failed to meet the applicable heightened pleading standards and consequently GRANTS Defendants' motion to dismiss.

## BACKGROUND

　　　Plaintiffs filed their initial putative class action complaint on August 12, 2013 in the United States District Court for the District of Massachusetts, alleging that Microsoft and four of its current and former executive officers violated federal securities laws by issuing a series

of false or misleading statements about Microsoft's Surface RT tablet and the company's inventory of the product. Dkt. # 1. The action was soon thereafter consolidated with a virtually identical putative class action complaint, both of which were transferred to this Court. *See* Dkt. # 49. The Plaintiffs filed their operative Consolidated Amended Complaint ("CAC") on January 24, 2014, asserting causes of action for violation of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. 78(j)(b), and Rule 10(b)-5, promulgated thereunder, 17 C.F.R. § 240.10b-5, as well as § 20(a) of the Exchange Act, 15 U.S.C. §§ 78t(a)-(b).

Plaintiffs consist of purchasers of Microsoft common stock during the period from January 24, 2013 through July 18, 2013 (the "Class Period") who were injured by Defendants' alleged violations. *See* CAC, ¶ 1. Defendants include Microsoft, former CEO Steven A. Ballmer, former CFO Peter S. Klein, and former CFO of the Windows division Tami Reller. All individual Defendants served as Microsoft officers during all or part of the Class period. *Id.*

Founded in 1975, Microsoft is a software, service, and solutions provider headquartered in Redmond, Washington and traditionally known for its Windows PC operating System and Office applications. *Id.* at ¶ 12. Historically, Microsoft distributed its products through original equipment manufacturers ("OEMs"), who purchase licenses for installation of the Windows operating system and other Microsoft products on hardware manufactured by the OEM prior to resale to the end-user. *See, e.g.*, Dkt. # 54 ("Dickey Decl.), Ex. 1, p. 10. Under his leadership as CEO, Ballmer announced a "significant shift" that would reposition Microsoft as a "devices and services company." *Id.* at Ex. 3, p. 2; CAC at ¶¶ 12, 29. In response to the successful release of tablets and touch screen devices by its competitors, accompanied by declining sales of x86 PCs and corresponding demand for Windows operating systems, Microsoft announced in July 2010 that development of a tablet would be its "job one urgency." CAC at ¶ 27. On June 18, 2012, Ballmer unveiled that

Microsoft would soon begin manufacturing and selling for the first time its own tablets, the Surface RT and Surface Pro. *Id.* at ¶ 29.

On October 26, 2012, Microsoft released to market the Surface RT, a device powered by an ARM chipset and running on Windows RT, a scaled down version of Microsoft's new Windows 8 operating system. *Id.* at ¶ 31. By contrast, Microsoft's Surface Pro tablet, not released until February 2013, would be capable of running the full Windows 8 operating system on an Intel chipset. *Id.* Microsoft disclosed in its June 2012 Form 10-K filing with the Securities and Exchange Commission ("SEC") that the Surface devices would compete directly with products manufactured by Microsoft's OEM partners, to whom it was simultaneously continuing to supply the Windows platform. Dickey Decl., Ex. 5, pp. 13-14.

Plaintiffs admit that Microsoft downplayed expectations for Surface RT sales, which some public commentators forecasted would sell poorly, particularly at the tablet's price point of $499-$699. CAC at ¶ 33. For instance, in November 2012, prior to the Class Period, Ballmer publicly labeled Surface RT sales as "modest." *Id.* Defendant Reller, appointed to the position of Windows CFO shortly thereafter, elaborated in a November 27, 2012 conference call with analysts: "We chose a quite limited distribution initially so that we could make sure that we were seeing how [the Surface RT] landed." *Id.* at ¶ 35. Plaintiffs further admit that despite Microsoft's efforts to clarify Ballmer's characterization of the tablet's "modest" release, analysts continued to speculate that Surface RT sales were failing to meet expectations. *Id.* at ¶ 36.

Plaintiffs nonetheless assert that throughout the Class Period, Defendants attempted to assure investors of a successful launch of its Surface RT tablets, which was seen as crucial to the future viability of its Windows division. *Id.* at ¶¶ 29-30. Specifically, Plaintiffs allege that Defendants painted the Surface RT as a driver of its Windows Division revenue and assured investors that its inventory level were within a healthy range, all the while failing to disclose that Microsoft held in excess of five million units of the Surface RT tablet in returned and unsold inventory. *Id.* at ¶¶ 39-43, 46. According to Plaintiffs, this scheme crumbled when on

ORDER DISMISSING CONSOLIDATED AMENDED COMPLAINT - 3

July 18, 2013, at the close of the Class Period, Microsoft was forced to announce that it would take a $900 million charge to account for the unsold RT inventory, reducing the price of the Surface RT by $150 to $349. *Id.* at ¶ 68. By the close of trading on July 19, 2013, Microsoft's stock had dropped over 11%, from $34.93 to $30.95 per share, representing a market capitalization loss of over $40 billion and the worst sell-off day of Microsoft shares in 13 years. *Id.* Ballmer's retirement from Microsoft followed shortly thereafter. *Id.* at ¶ 75.

**A. Allegedly False and Misleading Statements Issued During the Class Period**

**1. January 24, 2013 Conference Call and Form 10-Q**

The Class Period began on January 24, 2013, when Microsoft released its second quarter 2013 ("2Q 2013") financial results and hosted a conference call with analysts and investors. CAC, ¶ 39. Among those representing Microsoft on the call were Defendant Klein and Chris Suh, Microsoft's General Manager of Investor Relations. Regarding the 2Q 2013 results for Microsoft's Windows Division, Suh stated on the call that "[w]hile inventory levels ended the quarter at slightly higher levels than the prior year, we believe them to be in a health range given the recent launch of [Windows 8 and Surface RT.] Non-OEM revenue grew over 40%, driven by Windows 8 upgrades, sales of Surface, and double-digit growth in volume of licensing." *Id.* Plaintiffs also point to several statements by Klein, in which he told participants that Microsoft "recently increased production and expanded distribution [of Surface products] to third-party retail partners" and that "this quarter [Surface] was a contributing factor to the revenue growth in the Windows business." *Id.* at ¶¶ 39-40. He elaborated that Microsoft "obviously had limited distribution this quarter in our stores, and as you know, we're excited about expanding that." *Id.* at ¶ 40.

Klein specifically addressed Surface RT inventory at several points during the call. First, upon being prompted by a Morgan Stanley analyst who remarked that inventory appeared to be unusually high for the quarter, Klein responded: "Yes, the inventory is a function of both what is happening in the Xbox business and Surface. They're offsetting impacts this quarter. Some of it is from Surface and then some of it is from the Xbox

business." CAC, ¶ 41. Upon prompting, he clarified that "in inventory, yes, you're thinking about it right. We saw the normal draw-down from the Xbox business and any offsetting increase there was related to Surface." *Id.* Toward the end of the call, Klein was further asked by an analyst whether "the Windows outperformance was primarily…due to the inventory build." Klein responded:

> Yes, the three biggest components of the 11% total revenue growth…were the retail upgrades, the sales of Surface, and then multi-year licensing agreements within enterprises. To your point, there was some tailwind from inventory, which was normally, as you highlight, what we see in a launch quarter, and as Chris said, it is within the healthy range that we typically see.

*Id.* at ¶ 42.

Plaintiff also point to Microsoft's 2013 Form 10-Q, filed with the SEC on January 24, 2013 and approved and certified by Defendants Ballmer and Klein, in which Microsoft reported that "[r]evenue increased, primarily due to the launch of Window 8 and Surface on October 26, 2012." Microsoft similarly reported that revenue decrease resulting from the decline in the x86PC market was "offset in part by sales of Surface and Windows 8 upgrades." *Id.* at ¶ 43.

Plaintiffs allege that Defendants' positive statements about Surface RT sales were materially misleading when made because Defendants "failed to disclose that Microsoft had in excess of five million units of the Surface RT tablet, including components for the tablets, in returned and unsold inventory." *Id.* at ¶ 46. Plaintiffs assert that these misleading statements resulted in Microsoft stock trading at artificially inflated prices above $27 per share following January 24, 2013.

2. **February 13, 2013 Goldman Sachs Technology & Internet Conference**

Plaintiffs next point to remarks made by Defendant Klein at a Goldman Sachs Technology & Internet Conference on February 13, 2013. Addressing questions about Microsoft's experience with the Surface RT, Klein described its launch as "very controlled" and "limited to our stores, and our online, and some limited geographies." He added, "what we've done is to broaden the reach of what we're doing in distribution, get it out there in more geographies, and third party retail so people can actually come in, touch it, and play with it, and really get the full experience so that they really understand it." CAC, ¶ 49. Plaintiffs

allege that the characterization of the Surface RT launch as "controlled" created the impression that sales of the tablet were not falling below expectations, despite the undisclosed excess inventory. *Id.* at ¶ 50.

### 3. April 18, 2013 Conference Call and Form 10-Q

On April 18, 2013, Microsoft hosted a conference call with analysts and investors and publicly filed its 3Q 2013 Form 10-Q with the SEC. Addressing the 3Q 2013 results for Microsoft's Windows Division on the call, Suh stated that "[n]on-OEM revenue grew 40% this quarter, driven by sales of Surface and continued double-digit growth involving licensing." CAC, ¶ 54. He added that "similar to this quarter, revenue will continue to reflect sales of Surface and strong volume licensing, while OEM revenue will be impacted by the declining traditional PC market as we work to increase our share in tablets." *Id.* Regarding inventory, Suh remarked that "[t]his quarter, inventory levels were drawn down as the channel await new Windows 8 devices." He further asserted that Microsoft is "expanding distribution of Surface, we're now in 22 countries, 70 retailers." *Id.*

The Form 10-Q, approved and certified by Defendants Ballmer and Klein, similarly characterized the company's revenue growth. It reported that for 3Q 2013, Microsoft's "[r]evenue increased, primarily due to revenue from new products and services, including Windows 8 and Surface" and that "[r]evenue from Surface and increased commercial sales of Windows was offset by the impact on revenue of a decline in the x86 PC market." CAC, ¶ 55. That same day, Microsoft announced that Klein would be leaving Microsoft and would be replaced as CFO by June 30, 2013. *Id.* at ¶ 57.

Plaintiffs allege that Defendants' statements on April 18 were materially misleading in creating a positive impression of tablet sales while failing to disclose Microsoft's actual Surface inventory, resulting in Microsoft's common stock trading at artificially inflated prices above $29 per share.

### 4. May 14, 2013 JP Morgan Global Technology, Media, and Telecom Conference

On May 14, 2013, Defendant Reller answered numerous questions related to the Surface RT at a JP Morgan Conference in Boston, Massachusetts. Asked about reception for the Surface RT, Reller responded "[o]ur deep customer satisfaction surveys on the product

ORDER DISMISSING CONSOLIDATED AMENDED COMPLAINT - 6

show that there's very high satisfaction ratings with Surface. That's true on Surface Pro. That's true on Surface RT." CAC, ¶ 61. Asked about supply chain bottlenecks, Reller stated, "we really see that the touch supply is getting so much better, literally, week by week, month by month. And so the touch supply constraints are rapidly working themselves through." *Id.*

Plaintiffs again alleged that Reller's characterization of high satisfaction ratings with respect to the Surface RT created the impression of high demand for the Surface tablets, which was materially misleading in light of the undisclosed excess inventory.

### 5. May 30, 2013 Sanford C. Bernstein's Strategic Decisions Conference

Finally, Plaintiffs point to a statement by Microsoft's Chief Operation Officer, Kevin Turner, who spoke on behalf of the company at a conference in New York on May 30, 2013. In response to a question about the limited distribution of the Surface tablets, Turner responded: "Stay tuned, it's coming to more and more retail locations. It's coming to more and more channels. And we're building our supply chain. It's a whole new area for us as a company, and it's one that we're being thoughtful on but we're bringing it out strategically and it will continue to go broader and broader." CAC, ¶ 64.

Plaintiffs again allege that the statement was materially misleading in creating a positive impression of Surface sales while failing to disclose the excess Surface RT inventory.

### B. Post-Class Period Allegations

Plaintiffs assert that the class period closed on July 18, 2013, when Microsoft filed a Form 8-K with the SEC and issued a press release announcing that it was forced to take a $900 million charge to account for unsold and overvalued Surface RT inventory. Plaintiffs point to a variety of new reports, manifesting the surprise of analysts and investors at the size of the charge to income and the volume of unsold inventory. *See* CAC, ¶¶ 73-74.

### C. Motion to Dismiss

The instant Motion seeks dismissal of the CAC without leave to amend for failure to meet the applicable pleading standards with respect to the elements of falsity and scienter. *See* Dkt. # 53. First, Defendants deny that there was anything false or misleading about Microsoft's statements regarding historical sales, revenue, or inventory. Defendants assert that Plaintiffs fail to point to any aspect of the statements that was actually false. To Plaintiffs' contention that the statements were misleading because of the undisclosed inventory,

1  Defendants assert that Microsoft repeatedly acknowledged its unusually high Surface
2  inventory and that, regardless, Plaintiffs' claims constitute impermissible fraud by hindsight.
3  Defendants additionally assert that a number of the impugned statements are non-actionable
4  as a matter of law in that they constitute statements of opinion, of corporate optimism, and/or
5  represent forward looking statements accompanied by meaningful cautionary language that
6  are entitled protection under the PSLRA's safe-harbor provision. Second, Defendants contend
   that the CAC fails to plead facts with particularity giving rise to a strong inference of scienter.
7         On response, Plaintiffs assert that Defendants misrepresent their CAC as challenging
8  Microsoft's accounting and valuation of its inventory. According to Plaintiffs, the CAC
9  narrowly and specifically alleges that Defendants' statements were false and misleading
   because they failed to disclose the company's five million units of Surface RT tablets in
10 inventory. *See* Dkt. # 57, pp. 9-10. Plaintiffs assert that, even if objectively true, Defendants'
11 statements regarding robust Surface RT sales and speaking directly to inventory created an
12 obligation to disclose the quantity of unsold tablets. Plaintiffs additionally deny that any of the
   impugned statements constitute immaterial puffery or fall under the PSLRA's safe harbor
13 provision, both because they are not inherently forward-looking and because Microsoft failed
14 to qualify the statements with sufficient cautionary language. As to scienter, Plaintiffs assert
15 that Defendants' high-ranking positions and knowledge of core operations, coupled with their
16 actual statements, creates a sufficiently strong inference of knowledge to withstand a motion
17 to dismiss.
18         Both parties have offered into evidence in support of their positions public filings,
   press releases, and official records of conferences and conference calls. *See* Dickey Decl.;
19 Dkt. # 58 (Alpert Decl.). Upon a motion to dismiss, the Court's review is generally limited to
20 the contents of the pleadings. *See Allarcom Pay Television Ltd. v. Gen. Instrument Corp.*, 69
21 F.3d 381, 385 (9th Cir. 1995). This limitation does not embrace material that is properly
22 submitted as part of the complaint. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir.
23 2001). Where, as here, materials on which a plaintiff's complaint necessarily relies are not
24 physically attached to it, the Court may consider the documents if their authenticity is not
   contested without converting a motion to dismiss into one for summary judgment. *Id.*
25
26

Accordingly, the Court considers the exhibits of uncontested authenticity proffered by the parties, all of which are relied on in the CAC.

## LEGAL STANDARDS

### A. 12(b)(6) Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Where the plaintiff fails to "nudge[] [her] claims across the line from conceivable to plausible, [her] complaint must be dismissed." *Twombly*, 550 U.S. at 570. A claim is facially plausible if the plaintiff has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). In other words, the plaintiff must provide grounds for her entitlement to relief that amount to more than labels or conclusions and extend beyond a formulaic recitation of the elements of a cause of action. *Twombly*, 550 U.S. at 545. In making a Rule 12(b)(6) assessment, the court accepts all facts alleged in the complaint as true, and makes all inferences in the light most favorable to the non-moving party. *Baker v. Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009) (internal citations omitted).

### B. The Heightened Pleading Standard for Private Securities Fraud Claims

Securities fraud claims are subject to heightened pleading standards under Federal Rule of Civil Procedure 9(b) and the PSLRA. To satisfy Rule 9(b), a claim of fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Particularity under Rule 9(b) requires the plaintiff to plead the "who, what, when, where, and how" of the misconduct alleged. *Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009). Pursuant to the PSLRA, a complaint alleging private securities fraud must "plead with particularity both falsity and scienter." *In re Daou Systems, Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (quoting *Gompper v. VISX*, 298 F.3d 893, 895 (9th Cir. 2002)). A securities fraud complaint must consequently "specify each statement alleged to have been misleading, the

reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.*; 15 U.S.C. § 78u-4(b)(1). Notably, when examining whether plaintiffs' allegations of scienter are sufficient to survive a motion to dismiss under the PSLRA, the Court "must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper*, 298 F.3d at 897.

## ANALYSIS

### A. Section 10(b) Claim

Plaintiffs' principal claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10(b)-5. Rule 10b-5 provides, in relevant part, that it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To adequately state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege facts sufficient to show: "(1) a material misrepresentation or omission by the defendant, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation, (5) economic loss, and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1317 (quoting *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Through the instant Motion, Defendants contend that Plaintiffs have failed to plead both an actionable misrepresentation or omission[1] and the element of scienter. The Court agrees in both respects.

### 1. Misrepresentations or Omissions

---

[1] Plaintiffs correctly point out that Defendants do not explicitly challenge the materiality of the alleged misrepresentations and omissions, only the falsity of the former and the duty to disclose with respect to the latter.

ORDER DISMISSING CONSOLIDATED AMENDED COMPLAINT - 10

To meet the first element of a claim under Section 10(b) or Rule 10b-5, a complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)B). Plaintiffs must further show that Defendants made statements that were "*misleading* as to a material fact." *Matrixx Initiatives*, 131 S.Ct. at 1318 (quoting *Basic Incorporated, et al. v. Levison et al.*, 485 U.S. 224, 238 ( 1988)) (emphasis in original). A statement is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231-32.

Plaintiffs do not allege that any of Defendants' statements were literally false. Rather, the gravamen of Plaintiffs' Complaint is that Defendants' positive statements about the Surface RT were materially misleading. Specifically, Plaintiffs contend that Defendants touted robust sales of the Surface RT, creating the impression that it was raising revenue and meeting the company's expectations while all the while failing to disclose that Microsoft held five million returned and unsold Surface RT products and components in inventory. Plaintiffs' allegations in this respect fall short of stating a claim for fraud for several reasons. First, Plaintiffs fail to show that Defendants possessed a duty to disclose information that they did not fulfill. Similarly, Plaintiffs fail to show that Defendants' statements, if actionable, were either literally false or actually misleading when considered in context.

Where Plaintiffs rely on an omissions-based theory of liability, they must demonstrate that Defendants possessed a duty to disclose the withheld information. *See Basic*, 485 U.S. at 239 n. 17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). It is axiomatic that federal securities laws "do not create an affirmative duty to disclose any and all material information." *Matrixx*, 131 S.Ct. at 1321. Rather, the duty to disclose is triggered either by a specific requirement under the relevant regulations or "when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Id.* (internal alterations and quotation marks omitted) (citing 17 CFR § 240.10b-

5(b). This latter requirement is premised on the recognition that a statement, though literally accurate, may possess by virtue of the context or manner of its presentation, the ability to mislead investors. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).

Neither theory of liability is met by Plaintiffs' pleadings. First, Plaintiffs do not allege that Microsoft failed to disclose details of its inventory as specifically required by regulation. Indeed, as Defendants point out, the SEC's regulation S-X requires disclosure of the amounts of major classes of inventory, such as finished goods, raw materials, and supplies, but not the number of units in inventory by product. *See* 17 C.F.R. § 210.5-02(c)(6) (2014). Plaintiffs do not contend that Microsoft fell short of this or any other reporting requirement.

Second, Plaintiffs fail to show that any of Defendants' statements were misleading owing to the context or manner of their presentation. The Court is mindful of the Ninth Circuit's admonition that statements must be considered in the context of their total presentation. *Hughes v. Dempsey-Tegeler & Co.*, 534 F.2d 156, 176 (9th Cir. 1976). Taking this context into account, the Court is unable to infer that Defendants' statements of corporate optimism about the Surface RT's sales prospects were actually misleading, when considered along with Defendants' offsetting disclosures. Plaintiffs repeatedly admit that Defendants sought to qualify the success of the Surface RT, describing sales as "modest" and the release as "controlled." While Plaintiffs try to turn these statements into the basis for Defendants' motive to conceal excess inventory, they simultaneously undermine the allegation, on which Plaintiffs' theory of liability rests, that Microsoft was misleadingly inflating the product's success. The CAC similarly concedes that the market continued to take a negative view of the Surface RT throughout the class period. *See, e.g.,* CAC at ¶¶ 53 (discussing "continuing reports of underperforming Surface tablet sales"). This negative view may have been predicated in part on investors' awareness, demonstrated throughout the CAC, that Surface RT inventory was unusually high. Not only did Defendants refrain from countering this perception; they specifically acknowledged it during the January 24, 2013 conference call.

*See, e.g. id.* at ¶ 41 (acknowledging "offsetting increase" in inventory related to Surface RT); ¶ 42 (discussing "tailwind from inventory" related to it being a "launch quarter").[2]

Even more fundamentally, Plaintiffs have failed to allege any facts regarding the timing of Defendants' knowledge of excess inventory supposedly giving rise to a duty to disclose. Plaintiffs assert only that Microsoft's July 2013 announcement that it was taking a $900 million charge and reducing the price of its Surface RT led investors to assume that the company possessed a stock of over five million unsold tablets. *See* CAC ¶ 70 (citing article reporting that "taking the…write-down into account, it would suggest that Microsoft has a store of six million unsold Surface tablets") (emphasis omitted); ¶¶ 71-73. However, Plaintiffs do not offer anything other than conclusory assertions to suggest that Microsoft was indeed sitting on an inventory of five million tablets during the Class Period or that Microsoft regarded or should have regarded its then-held inventory as worrisomely large. Absent such facts, Plaintiffs' theory of the case represents a classic example of impermissible fraud by hindsight, a type of pleading that the PSLRA was specifically directed at eliminating. *See In re Vantive Corp. Securities Litigation*, 283 F.3d 1079, 1084 (9th Cir. 2002) (abrogation on other grounds recognized by *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008)).

Standing alone, the fact that Microsoft reduced the retail price of the Surface RT in July 2013 does not make its positive statements about the product months earlier actionably misleading. The Ninth Circuit has repeatedly reaffirmed this rule, explaining that the fact that a company's "forecast turned out to be incorrect does not retroactively make it a misrepresentation." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 389 (9th Cir. 2010). District courts uniformly reject such arguments. *See, e.g., Callan v. Motricity Inc.*, 2013 WL 5492957,

---

[2] Among the allegedly misleading statements cited in the CAC is Suh's remark on the April 18, 2013 conference call, in which he stated, "[t]his quarter, inventory levels were drawn down as the channel awaits new Windows 8 devices." CAC, ¶ 54. Defendants aptly point out, and Plaintiffs do not dispute, that Defendant Klein clarified later in the call that Suh's statement related to Windows 8 inventory held by third-party OEMs, rather than Microsoft's own Surface RT inventory. *See* Dickey Decl., Ex. 7 at p. 12 (remarking in response to request for clarification of Windows inventory at OEMs, "I did mention the fact that we believe inventories were drawn down. We do think that they're at normal levels at this point though").

* 7 (W.D. Wash. 2013) ("Plaintiffs have not pleaded facts demonstrating that [defendant's] contract was not 'on track' or 'on schedule' when those statements were made."); *Shemian v. Research in Motion Ltd.*, 2013 WL 1285779, *21 (S.D.N.Y.) ("Plaintiff nowhere pleads facts supporting the inference that, at the time of their statements, Defendants were aware of information contradicting their statements…."). A recent decision from the Northern District of California is instructive. In *In re Silicon Storage Technology, Inc.*, 2006 WL 648683 (N.D. Cal. 2006), the district court dismissed securities fraud claims based, in part, on allegedly fraudulent valuation of inventory. In doing so, the court found that the complaint failed to state any reasons why at the time of the alleged misstatements the disclosed valuations were inaccurate. *Id.* at * 7. The court refused to credit as "fraud by hindsight" plaintiffs' allegations that "because SST wrote down its inventory in December 2004, the statements about inventory made prior to that time must have been false because the inventory turned out not to be worth what SST had previously said it was worth." *Id.* Here, too, the Court rejects Plaintiffs' attempt to turn Defendants' earlier statements into fraud based on later-in-time information.

     Further, the Court agrees with Defendants that many of the specific impugned statements are not actionable as a matter of law. Plaintiffs, for instance, rely heavily on Suh's January 24, 2013 characterization of Microsoft's inventory levels as being "in a healthy range given the recent launch of [Windows 8 and Surface RT]." *See* CAC, ¶ 39. Aside from the fraud-by-hindsight problems discussed *supra*, this statement represents the sort of vague statement of opinion that is insufficient to support a claim of securities fraud. For the purposes of securities litigation, misleading opinions, as opposed to statements of fact, give rise to a claim "only if the complaint alleges with particularity that the statements were both objectively and subjectively false or misleading." *McGuire v. Dendreon Corp.*, 688 F.Supp.2d 1239, 1242 (W.D. Wash. 2009) (quoting *Rubke v. Capital Bancorp Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009)). Plaintiffs fail to plead facts sufficient for this Court to conclude

either that the inventory ranges were not objectively "healthy" as of January 2013, or that Suh did not subjectively believe them to be "healthy" at the time that he so characterized them.[3]

The Court similarly agrees with Defendants that other of the impugned statements – such as Reller's May 2013 statement that "customers love Surface" (CAC, ¶ 61) – constitute mere puffery, which is also not actionable as a matter of law. Such "vague and amorphous statements do not give rise to liability for securities fraud, since reasonable investors do not consider such puffery material when making an investment decision." *In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858, *7 (N.D. Cal. 2005) (dismissing as puffery statement such as "[o]ur quarter was stellar for one reason, consumers love our service"); *see also Callan*, 2013 WL 5492957 at * 6.

On response, Plaintiffs argue that Defendants' positive statements about Surface RT sales, coupled with direct references to inventory, created in Microsoft a duty to disclose excess inventory. Again setting aside fraud-by-hindsight problems with this position, the cases on which Plaintiffs rely are clearly distinguishable and indeed suggest that the statements cited in the CAC did not create such an obligation in this instance. For instance, Plaintiffs cite to *In re Questcor Sec. Litig.*, 2013 WL 5486762 (C.D. Cal. 2013) for the proposition that "[h]aving fostered the impression of positive unmet demand for the Surface RT, defendants were obligated to disclose the material fact that Microsoft had in inventory over five million units of the tablet." Dkt. # 57, p. 16. The *Questcor* court did indeed locate material misrepresentations where the company lauded positive test results while omitting adverse information. *See Questcor*, 2013 WL 548672, * 11. Yet unlike in the instant case, the *Questcor* court's finding was predicated on the fact that the defendant corporation had "terminat[ed] studies whose results would not benefit" the corporation, thereby deliberately concealing the adverse information from the public. *Id*. No such manipulation can be inferred

---

[3] While the Court does not agree that Suh's comment is necessarily "forward looking" so as to bring it within the ambit of the PSLRA's safe harbor provision, 15 U.S.C. § 78u-5(c)(1)(A)-(C), this disagreement does not affect the result of the Court's analysis.

from Plaintiffs' pleadings in the instant case. *Cf. In re STec, Inc. Sec. Litig.*, 2011 WL 2669217, **6-9 (C.D. Cal. 2011) (finding material misrepresentation where complaint included particularized allegations showing that defendant corporation knowingly misled investors about the one-off nature of a $120 million contract).

Plaintiffs' reliance on *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982 (2008), is similarly misplaced. The Ninth Circuit therein found material misrepresentations where a company had continued to count stopped work as part of its backlog, creating the impression that it would fulfill contracts and receive payments for $10 million worth of work that it knew would never be performed. *Id.* Unlike the plaintiff in *Berson*, Plaintiffs here do not allege that Microsoft concealed or in any way manipulated the value of its inventory. Indeed, unlike in *Berson*, they barely addressed inventory at all, and only then either as required by the SEC or to explain its discrepancies with past quarters. These limited references do not meet the level of specificity present in *Berson* to trigger a duty to fully disclose the value of each inventoried product line. *Cf. id.* ("Had defendants released no backlog reports, their failure to mention the stop-work orders might not have misled anyone."). Absent particularized allegations showing that Microsoft possessed, by virtue of its statements or otherwise, a duty to disclose Surface RT inventory levels and specifying the timeframe in which this information should have been disclosed, the Court cannot find that Plaintiffs' allegations meet the heightened pleading requirements to satisfy the first prong of their Section 10(b) and Rule 10b-5 claims.

### 2. Scienter

The Court also agrees with Defendants that the CAC fails to demonstrate a sufficiently strong inference of scienter under the PSLRA and Rule 9(b). The PSLRA requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To satisfy this state of mind element, the "complaint must allege that the defendant made false or misleading statements either intentionally or with deliberate recklessness." *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694 (9th Cir. 2012) (quoting *Zucco Partners, LLC v. Digimarc Corp.*,

552 F.3d 981, 991 (9th Cir. 2009) (internal alterations omitted)). That is, plaintiffs must show that the defendants engaged in knowing or intentional conduct. *South Ferry,* 542 F.3d at 782. While facts showing a motive and opportunity to commit fraud "provide some reasonable inference of intent," they are "not sufficient to establish a strong inference of deliberate recklessness." *In re Verifone*, 704 F.3d at 701. The Supreme Court has instructed that allegations are to be reviewed "holistically" in determining whether scienter has been adequately pled. *Id.* (quoting *Matrixx*, 131 S.Ct. at 13224). At the end of the day, "[a] complaint will survive…only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

Here, Plaintiffs' scienter allegations rely principally on what has been termed "the core-operations inference."*See e.g.*, Dkt. # 57 at p. 25-28 (discussing Defendants' involvement in daily operations, responsibility for product and marketing oversight, and other aspects of their executive positions from which knowledge of inventory levels could be inferred). The Ninth Circuit in *South Ferry* addressed the viability of the core-operations theory in considering "whether a scienter theory that infers that facts critical to a business's 'core operation' or an important transaction are known to a company's key officers satisfies the PSLRA's heightened pleading standards." *See South Ferry*, 542 F.3d at 783. The court concluded that, in light of the Supreme Court's reasoning in *Tellabs*, a complaint "will usually fall short of the PSLRA standard" where it "relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information." *Id.* at 784. Reliance on the core operations inference must be accompanied, for instance, by "specific allegations about management's exposure to factual information within the company," such as their actual monitoring of the data that was the subject of the fraud claim or detailed statements showing defendants' actual knowledge. *Id.* at 785. In addition, in rare circumstances, core operations allegations may in themselves satisfy the PSLRA's standards where they show that it would be "absurd to

suggest that management was without knowledge of the matter." *Id.* (citing *Berson*, 527 F.3d at 988).

The allegations in the CAC fall short of these pleading standards. Plaintiffs have not shown by virtue of Defendants' high-level executive positions alone that it would be "absurd" that they would not have detailed knowledge of the inventory of the Surface RT product line, as well as the more pertinent knowledge that Microsoft would be unable to sell its Surface RT inventory or that the inventory was overvalued until the decision was made to reduce the retail price. *Cf. Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014) (finding that it would be "absurd" to believe that the "external and internal gatekeeper of information on the Prudhoe Bay pipelines" would not have knowledge about internal company information that contradicted her specific statements). Nor do Defendants' statements discussing publicly disclosed revenue streams and inventory levels show that they had actual access to the information that would have rendered their statements knowingly or recklessly misleading. *Cf. id.* at 576-77 (inferring from executive's own statement that she had "actual access" to the relevant data where she referenced specific conditions found in the pipelines); *Verifone*, 704 F.3d at 708-09 (finding scienter adequately pled by allegations that defendants received accurate reports indicating that company had not met its financial targets and made improper accounting adjustments to conform reports to expectations). Simply put, Plaintiffs' allegations lack the something more that would allow their core operations theory to pass muster.

While it is possible to infer that Defendants possessed a motive to overly hype a product on whose viability they had largely staked their reputation, motive alone is insufficient to overcome competing inferences. *See In re Verifone*, 704 F.3d at 701. Further, the inference of motive is particularly weak here, where there are no allegations of stock sales by corporate insiders or other suspicious activities manifesting Defendants' intent to deceive the market. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 2012 WL 6136756, * 8 (C.D. Cal. 2012) ("Even if Plaintiffs had alleged facts that might be sufficient to give rise to a strong

inference of scienter, a strong inference of scienter is negated when there is an absence of stock sales or where such sales are minimal) (citing cases).[4]

Read together, Plaintiffs allegations do not raise a sufficiently strong inference of Defendants' actual knowledge or recklessness. The CAC provides no evidence that Surface RT inventory levels were worrisomely inflated or overvalued during the Class Period, nonetheless that Defendants were cognizant or should have known of this fact prior to the July 2013 disclosure. Considered holistically, Plaintiffs' allegations do not overcome the competing inference that Defendants simply miscalculated the demand for a new product. *See Shemian*, 2013 WL 1285779 at * 19 (finding that plaintiffs "have failed to plead facts giving rise to an inference of scienter at least as compelling as the more obvious, yet less sinister, conclusion that Defendants simply miscalculated and poorly executed on the development of new products in a fast-moving and highly competitive industry"). While the CAC certainly supports the inference that Defendants poorly managed a critical product release for Microsoft, managerial shortcomings, however costly, do not in themselves amount to actionable fraud under federal securities law. *See, e.g., In re Silicon*, 2006 WL 648683 at *23 ("Generally speaking, incidents of fiduciary misconduct and internal mismanagement are not by themselves sufficient to trigger liability under the Exchange Act.").

### B. Section 20(a) Claim

A Section 20(a) claim requires underlying primary violations of the securities laws. 15 U.S.C. §§ 78t(a); *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012). Because Plaintiffs have failed to plead an underlying violation of the federal securities laws, their control persons theory must also be dismissed.

### C. Leave to Amend

---

[4] Plaintiffs ask that the Court disregard evidence introduced by Defendants of Microsoft's repurchase of 90 million shares of its own stock in advance of the July 2013 disclosure as outside of the pleadings. While this fact is a matter of public record of which the Court may take judicial notice, the Court does not consider it to negate an inference of scienter, particularly where the buyback preceded the Class Period. *See* Dickey Decl., Ex. 8 at p. 44 ("During the three and six months ended December 2012, we repurchased approximately 58 million and 90 million shares of Microsoft common stock…."). Nonetheless, the Court's conclusion that Plaintiffs have insufficiently pled scienter is unaffected.

Where claims are dismissed under Rule 12(b)(6), the court "should grant leave to amend…unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000); Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). Leave to amend need not be granted, and dismissal may be ordered with prejudice, if amendment would be futile. *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998); *see also Lucas v. Dept. of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995). As the Court finds that Plaintiffs could conceivably plead facts sufficient to meet the heightened pleading standards with respect to the first two elements of their Section 10(b) and Rule 10b-5 claim, the Court must grant Plaintiffs leave to amend their Complaint. Any amended complaint shall, however, be dismissed with prejudice should it fail to plead actionable misrepresentations or omissions as well as scienter with the required specificity.

## CONCLUSION

For the reasons stated herein, the Court hereby finds and ORDERS:

(1) Defendants' Motion to Dismiss the Consolidated Amended Complaint (Dkt. # 53) is GRANTED.

(2) Plaintiffs are GRANTED leave to amend. Plaintiffs shall file a Second Consolidated Amended Complaint no later than thirty (30) days from the entry of this Order.

Dated this 12th day of December 2014.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE